McCORRISTON MILLER MUKAI MacKINNON LLP

| | |
|---|---|
| MARGUERITE S. N. FUJIE | 8599-0 |
| MIYOKO T. PETTIT-TOLEDO | 10412-0 |

Five Waterfront Plaza, 4th Floor
500 Ala Moana Boulevard
Honolulu, Hawaii 96813
Telephone No.: (808) 529-7300
Facsimile No.: (808) 524-8293
E-mail: mfujie@m4law.com
        pettit-toledo@m4law.com

Attorneys for Plaintiff
DAVID COBURN

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| DAVID COBURN, | CIVIL NO. _____ |
| Plaintiff, | COMPLAINT; DEMAND FOR JURY TRIAL; CIVIL COVER SHEET |
| vs. | |
| LOCKHEED MARTIN OPERATIONS SUPPORT, LLC; JOHN DOES 1-20; JANE DOES 1-20; DOE CORPORATIONS 1-20; DOE PARTNERSHIPS 1-20; DOE ENTITIES 1-20, | |
| Defendant. | |

# COMPLAINT

Plaintiff DAVID COBURN, by his undersigned attorneys, for his complaint against LOCKHEED MARTIN OPERATIONS SUPPORT, LLC ("Defendant"), alleges as follows:

## THE PARTIES

1. Plaintiff DAVID COBURN ("Mr. Coburn") is and was a resident of the City and County of Honolulu, State of Hawai'i, and subject to the jurisdiction of this Court.

2. Upon information and belief, Defendant LOCKHEED MARTIN OPERATIONS SUPPORT, LLC ("Defendant"), is and was, at all times relevant hereto, a Foreign Limited Liability Company, formed under the laws of Delaware and doing business in Hawai'i for the purpose of "U.S. Government Services Contracting." Upon information and belief, Defendant has one managing member, Lockheed Martin Services, LLC. Upon information and belief, Defendant has at least five hundred (500) or more employees. Mr. Coburn is unaware of the true names and capacities of the defendants sued herein as additional Defendants John Does 1-20, Jane Does 1-20, Doe Corporations 1-20, Doe Partnerships 1-20, and Doe Entities 1-20 (collectively, "Doe Defendants"), inclusive, and for that reason, Mr. Coburn sues defendants under fictitious names. Upon information and belief, the Doe Defendants are responsible in some manner for the occurrences alleged

herein.  Mr. Coburn respectfully requests leave to amend this Complaint and/or designate additional defendants when the true names, capacities, and/or responsibilities of such Doe Defendants are ascertained.  As alleged herein, "Defendants" shall mean all named defendants and all fictitiously named Doe Defendants.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that this is a civil action between citizens of Hawaiʻi and Delaware, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this civil action arises under the Americans with Disabilities Act of 1990 ("ADA"), as amended by the ADA Amendments Act of 2008 ("ADAAA"), 42 U.S.C. §§ 12101 to 12213 (collectively, the "ADA").  This Court also has supplemental jurisdiction over Mr. Coburn's related claims arising under Hawaiʻi state law pursuant to 28 U.S.C. § 1367(a).

5. Venue is proper in this district under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this district.

## **GENERAL ALLEGATIONS**

6. In or around November 2000, Mr. Coburn began working as an Engineering Technician I at the MK-48 Torpedo Intermediate Maintenance Facility, located in Ewa Beach, Hawai'i (the "Facility"), via a Department of Defense Naval Sea Systems Command ("NAVSEA") contract with the Raytheon Company ("Raytheon").

7. Upon information and belief, in or around December 2007, Defendant took over the NAVSEA contract for the Facility and hired certain of Raytheon's employees, including Mr. Coburn. Because Mr. Coburn held the position of Engineering Technician III with Raytheon, Defendant employed him as an Engineering Technician III.

8. As an Engineering Technician III, his duties included, among other things, reading and interpreting engineering drawings, performing functional weapons testing, completing structural teardowns of weapons for analysis and rebuild, and assembling weapons. As a senior Engineer Technician, Mr. Coburn was also responsible for troubleshooting to board level, training other technicians, and providing quality assurance for weapons. Because of his experience and excellent work performance, Mr. Coburn was also appointed as a team leader for ordnance handling and the designated leader for response teams in the event of an emergency or accident.

9. While employed by Defendant, Mr. Coburn had never been disciplined for poor work performance or received a negative work performance review, but met or exceeded Defendant's legitimate expectations.

10. On January 3, 2016, Mr. Coburn suffered from a stroke. As a result of the stroke, Mr. Coburn was hospitalized and unable to work for several months while he recovered.

11. Mr. Coburn provided Defendant's Senior Labor Relations Representative, Lisa Hardin ("Ms. Hardin"), with the Cigna Work Ability/Return to Work Form, completed by his doctor on June 24, 2016 ("First RTW Form"). The First RTW Form indicated that Mr. Coburn was released to a graduated return to work on July 2, 2016, in a full-time sitting job, with the following physical restrictions/limitations: (1) no lifting, pulling, or pushing items over 10 lbs.; (2) no prolonged bending, stooping or twisting motion; (3) no working in a squatting or kneeling position; (4) no climbing; (5) no overhead work; and (6) no work on power moving equipment, on platforms higher than 3 feet or within 6 feet of dangerous machinery. Although the First RTW Form requested that the person completing the form check off whether the employee was restricted from climbing stairs or ladders, Mr. Coburn's doctor checked off neither.

12. Mr. Coburn requested that he be permitted to return to work as an Engineering Technician III with a modified work schedule and some restrictions,

and if Defendant could not accommodate the restrictions/limitations, that he be assigned to another position as a reasonable accommodation.

13. On July 1, 2016, the day before Mr. Coburn's short-term disability was to end, Defendant informed Mr. Coburn that he could not return to work on July 2, 2016, because there were no positions available at the Facility or at any other Lockheed facility located in Hawaiʻi that could accommodate Mr. Coburn's restrictions/limitations. As such, Defendant informed Mr. Coburn that he could go on unpaid medical leave, or be terminated on July 2, 2016. Given this option, Mr. Coburn requested, through his union representative, to be placed on unpaid medical leave for sixty (60) days.

14. On or about July 8, 2016, Mr. Coburn timely filed a charge of disability discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") ("First Charge").

15. On or around July 18, 2016, Ryan Cole ("Mr. Cole"), a representative from Defendant's Leave and Disability Center, contacted Mr. Coburn and informed him that his health insurance benefits terminated effective July 19, 2016. Also, rather than being placed on unpaid medical leave for sixty (60) days, Mr. Cole also informed Mr. Coburn that he had been placed on Extended Medical Leave, effective June 30, 2016, through December 28, 2016, during which he would not be paid.

16. Mr. Cole also explained to Mr. Coburn that he would be eligible to return to work after the Extended Medical Leave without going through the rehire process, and that Mr. Coburn would receive preferential consideration if he applied for other positions as an internal applicant. However, Mr. Cole also informed Mr. Coburn that unless he could return to work without any restrictions, he would be terminated.

17. As Defendant terminated Mr. Coburn's internal access within weeks of Mr. Coburn's stroke, he did not receive notifications of position vacancies that were made available to internal applicants and could not apply as an internal applicant, and as such could not receive any preferential consideration for open positions.

18. On November 2, 2016, Defendant advertised a Quality Assurance Analyst Associate position ("QA position") at the Facility by posting the vacant position on Indeed.com, a public, external nationwide jobs website.

19. The day after Defendant posted the QA position vacancy, Mr. Coburn applied as an external applicant for the QA position. Although Mr. Coburn was qualified for the QA position and could perform the physical requirements of that position, Defendant did not interview, extend an offer for hire, or hire Mr. Coburn for that position. Defendant also did not offer to provide this position as a reasonable accommodation to Mr. Coburn.

20. Upon information and belief, Defendant filled the QA position at the Facility with a less qualified, external applicant during the week before the position was advertised on Indeed.com.

21. As of December 8, 2016, Defendant continued to advertise the QA position on Indeed.com.

22. On December 19, 2016, Ms. Hardin wrote a letter to Mr. Coburn notifying him that his Extended Medical Leave would expire on December 31, 2016. She also informed Mr. Coburn that unless he could provide updated medical restrictions for Defendant's consideration before December 29, 2016, he would be administratively terminated effective December 31, 2016. If Mr. Coburn's restrictions had changed, Ms. Hardin stated that Defendant would extend his leave until January 13, 2017, pending review of his updated restrictions.

23. On or about December 19, 2016, Mr. Coburn timely filed a second charge of disability discrimination and retaliation with the EEOC ("Second Charge").

24. Mr. Coburn provided Ms. Hardin with a Cigna Work Ability/Return to Work Form, completed by his doctor on January 11, 2017 ("Second RTW Form") that released him to work on a reduced schedule with the following updated physical restrictions: (1) no lifting, pushing or pulling over 20 lbs.; (2) no prolonged bending, stooping or twisting motion; (3) no climbing; (4) no overhead

work; and (5) no work on power moving equipment, on platforms higher than 3 feet or within 6 feet of dangerous machinery. The Second RTW Form no longer limited Mr. Coburn to only full-time sitting positions, and increased the weight he could lift, pull or push from 10 lbs. to 20 lbs. As with the First RTW Form, the Second RTW Form requested that the person completing the form check off whether the employee was restricted from climbing stairs or ladders, and Mr. Coburn's doctor checked off neither.

25. Mr. Coburn's doctor also indicated on the Second RTW Form that he should be contacted for more information. At no point did Defendant contact Mr. Coburn's doctor to obtain more information or clarification regarding Mr. Coburn's return to work status and restrictions.

26. On January 20, 2017, Ms. Hardin sent another letter to Mr. Coburn in which she noted that upon reviewing his updated medical restrictions against positions in the MK48 program, Defendant determined that it was unable to accommodate Mr. Coburn's restrictions. Ms. Hardin also informed Mr. Coburn that Defendant reviewed nationwide opportunities within Defendant's Rotary Missions Systems program, but was unable to find "a job match." As such, Ms. Hardin encouraged Mr. Coburn to review Defendant's internal career opportunities portal and provide her with a list of requisition numbers that he may be interested

in pursuing, and if there were none for which Defendant believed him qualified, he would be administratively terminated effective February 12, 2017.

27.    On February 8, 2017, Mr. Coburn responded to Ms. Hardin's letter dated January 20, 2017, and noted that, because Defendant had suspended and/or terminated his access to Defendant's internal career opportunities portal shortly after his stroke, he could not receive notifications and apply for vacancies that were posted internally. Mr. Coburn further stated that, despite applying for the QA position soon after its posting, he was not considered for that available position.

28.    On February 17, 2017, Ms. Hardin notified Mr. Coburn in writing that he had been administratively terminated effective as of February 12, 2017, because Defendant was unable to "safely or reasonably accommodate" his restrictions for available positions at MK48, including the "Technician and Quality Assurance Analyst" positions. Ms. Hardin further explained: "Importantly, employees must have the ability to evacuate themselves in the event of an emergency to the muster areas outside the explosive arc over a ¼ miles away from the work site. Based on our assessment, we determined that we could not safely or reasonably accommodate your restrictions."

29.    Upon information and belief, the job descriptions for an Engineering Technician III and for a Quality Assurance Analyst Associate did not, and do not, state any physical requirement for evacuation of the Facility.

30.     Defendant never asked Mr. Coburn if he could not safely evacuate the Facility in the event of an emergency, and no doctor's note stated a physical restriction on Mr. Coburn's ability to walk and safely evacuate the Facility in the event of an emergency.

31.     In her February 17, 2017, letter, Ms. Hardin also repeated that Defendant conducted a review of nationwide positions within Defendant's Rotary Missions Systems program, but did not find a job for which Mr. Coburn was qualified, with or without a reasonable accommodation.

32.     Upon information and belief, Defendant has previously accommodated similarly-situated employees by allowing them to work at full-time sitting positions before returning to more physically demanding positions at the Facility.  Upon information and belief, Defendant made no similar determination as to these similarly-situated employees' ability or inability to safely evacuate the Facility.

33.     Despite being released back to work on July 2, 2016, with certain physical restrictions, and again on January 11, 2017, with updated physical restrictions, Defendant terminated Mr. Coburn on February 12, 2017.

34.     Just about six months before his termination, Mr. Coburn reported Defendant's disability discrimination when he filed the First Charge.

35. Just about two months before his termination, Mr. Coburn again reported Defendant's disability discrimination when he filed the Second Charge.

36. Despite the availability of the QA position, for which Mr. Coburn was qualified, without or without an accommodation, Defendant terminated Mr. Coburn.

37. On March 29, 2018, the EEOC issued Mr. Coburn a Dismissal and Notice of Rights ("Right to Sue Notice") related to the First Charge.

38. On or about June 16, 2017, Mr. Coburn timely filed a third charge of disability discrimination and retaliation with the EEOC ("Third Charge").

39. The Second and Third Charges are currently pending before the EEOC.

## COUNT I
**(Failure to Provide a Reasonable Accommodation in Violation of the Americans With Disabilities Act, 42 U.S.C. § 12181 et seq.)**

40. Mr. Coburn repeats and realleges paragraphs 1 through 39 hereof, as if fully set forth herein.

41. On or about January 3, 2016, Mr. Coburn suffered from a stroke and was diagnosed with physical limitations, including but not limited to lifting, standing, and bending.

42. Mr. Coburn could perform the essential functions of his position as an Engineering Technician III with reasonable accommodation.

43. On or about June 30, 2016, Mr. Coburn notified Defendant about his disability and requested a reasonable accommodation.

44. Defendant could have accommodated Mr. Coburn's physical limitations with a full-time sitting position, as it had previously done so for other similarly-situated employees. A full-time sitting position would have been effective and would not have posed an undue hardship to Defendant.

45. Defendant could have also accommodated Mr. Coburn with the QA position for which he applied and was qualified. This position was available, would have been effective, and would not have posed an undue hardship to Defendant.

46. Defendant failed to engage in the interactive process, denied Mr. Coburn's request for reasonable accommodation, and failed to provide any accommodation.

47. Defendant did not allow Mr. Coburn to return to work in any capacity. As a result, Mr. Coburn's health care benefits terminated, he was forced to go on unpaid Extended Medical Leave, and he was later administratively terminated.

48. Mr. Coburn suffered damages as a result of Defendant's unlawful discriminatory actions, including but not limited to emotional distress, past and future lost wages and benefits, and the costs of bringing this action.

49. Defendant intentionally violated Mr. Coburn's rights under the ADA with malice or reckless indifference, and, as a result, is liable for punitive damages.

## COUNT II
### (Retaliation in Violation of the Americans With Disabilities Act, 42 U.S.C. § 12181 et seq.)

50. Mr. Coburn repeats and realleges paragraphs 1 through 49 hereof, as if fully set forth herein.

51. Mr. Coburn was qualified for his position when Defendant administratively terminated him on February 12, 2017.

52. On or about July 8, 2016, Mr. Coburn filed the First Charge, and on or about December 19, 2016, Mr. Coburn filed the Second Charge. Mr. Coburn reported Defendant's disability discrimination and retaliation.

53. Approximately six months after he filed his First Charge and approximately two months after he filed his Second Charge, Defendant terminated Mr. Coburn on February 12, 2017, claiming that it had no position nationwide available to him, with or without any accommodation.

54. Defendant's alleged reason for terminating Mr. Coburn's employment is pretextual and baseless. Despite the availability of the QA position during the time when Ms. Hardin was purportedly looking for other positions for Mr. Coburn in Defendant's Rotary Mission Systems program, Defendant did not consider

Mr. Coburn for such a position and filled it with a less experienced applicant who was not currently employed by Defendant.

55. Defendant terminated Mr. Coburn because he reported disability discrimination on or about July 8, 2016, when he filed the First Charge and again on or about December 19, 2016, when he filed the Second Charge.

56. Mr. Coburn suffered damages as a result of Defendant's unlawful retaliatory actions, including but not limited to front pay and benefits (in lieu of reinstatement) and the costs of bringing this action.

## COUNT III
### (Disability Discrimination - Violation of HRS §§ 378 et seq.)

57. Mr. Coburn repeats and realleges paragraphs 1 through 56 hereof, as if fully set forth herein.

58. On or about January 3, 2016, Mr. Coburn suffered from a stroke and was diagnosed with physical limitations, including but not limited to lifting, standing, and bending.

59. Mr. Coburn could perform the essential functions of his position as an Engineering Technician III with reasonable accommodation.

60. On or about June 30, 2016, Mr. Coburn notified Defendant about his disability and requested a reasonable accommodation.

61. Defendant could have accommodated Mr. Coburn's physical limitations with a full-time sitting position, as it had previously done so for other

similarly-situated employees. A full-time sitting position would have been effective and would not have posed an undue hardship to Defendant.

62. Defendant could have also accommodated Mr. Coburn with the QA position for which he applied and was qualified. This position was available, would have been effective, and would not have posed an undue hardship to Defendant.

63. Defendant failed to engage in the interactive process, denied Mr. Coburn's request for reasonable accommodation, and failed to provide any accommodation.

64. Defendant did not allow Mr. Coburn to return to work in any capacity. As a result, Mr. Coburn's health care benefits terminated, he was forced to go on unpaid Extended Medical Leave, and he was later administratively terminated.

65. Mr. Coburn suffered damages as a result of Defendant's unlawful discriminatory actions, including but not limited to emotional distress, past and future lost wages and benefits, and the costs of bringing this action.

66. Defendant intentionally violated Mr. Coburn's rights under the HRS with malice or reckless indifference, and, as a result, is liable for punitive damages.

## COUNT IV
### (Retaliation in Violation of HRS §§ 378 et seq.)

67.  Mr. Coburn repeats and realleges paragraphs 1 through 66 hereof, as if fully set forth herein.

68.  Mr. Coburn was qualified for his position when Defendant administratively terminated him on February 12, 2017.

69.  On or about July 8, 2016, Mr. Coburn filed the First Charge, and on or about December 19, 2016, Mr. Coburn filed the Second Charge. Mr. Coburn reported Defendant's disability discrimination and retaliation.

70.  Approximately six months after he filed his First Charge and approximately two months after he filed his Second Charge, Defendant terminated Mr. Coburn on February 12, 2017, purportedly because Defendant had no position nationwide available to him, with or without any accommodation.

71.  Defendant's alleged reason for terminating Mr. Coburn's employment is pretextual and baseless. Despite the availability of the QA position during the time when Ms. Hardin was purportedly looking for other positions for Mr. Coburn in Defendant's Rotary Mission Systems program, Defendant did not consider Mr. Coburn for such a position and filled it with a less experienced applicant who was not currently employed by Defendant.

72. Defendant terminated Mr. Coburn because he complained of disability discrimination on or about July 8, 2016, when he filed the First Charge and again on or about December 19, 2016, when he filed the Second Charge.

73. Mr. Coburn suffered damages as a result of Defendant's unlawful retaliatory actions, including but not limited to emotional distress, past and future lost wages and benefits, and the costs of bringing this action.

74. Defendant intentionally violated Mr. Coburn's rights under the HRS with malice or reckless indifference, and, as a result, is liable for punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff DAVID COBURN prays for judgment on the Complaint as follows:

A. That this Court accept jurisdiction over this matter;

B. That this Court find in favor of Mr. Coburn and against Defendant;

C. That this Court award Mr. Coburn for his past and future loss of wages and benefits, plus interest, in an amount to be proven at trial;

D. That this Court award Mr. Coburn compensatory and punitive damages, in an amount to be proven at trial;

E. That this Court order and award Mr. Coburn, front pay including benefits, in an amount to be proven at trial, in lieu of reinstatement;

F. That this Court award Mr. Coburn his costs and reasonable attorneys' fees incurred in connection with this action; and

G. That this Court grant such additional or alternative and further relief as the Court deems just and proper.

DATED:  Honolulu, Hawaii, June 27, 2018.

       /s/ Marguerite S. N. Fujie
       MARGUERITE S. N. FUJIE
       MIYOKO T. PETTIT-TOLEDO

       Attorneys for Plaintiff
       DAVID COBURN